**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MARK LANGFORD,                           CASE NO. 2:12-CV-0096

      Petitioner,

v.                                       JUDGE GREGORY L. FROST
                                         **Magistrate Judge Kemp**

WARDEN, ROSS
CORRECTIONAL INSTITUTION,

      Respondent.

## REPORT AND RECOMMENDATION

Petitioner Mark Langford, a state prisoner, has filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This case is before the Court on the petition, the Return of Writ (with exhibits), and petitioner's reply. For the following reasons, it will be recommended that petitioner be granted relief on his second ground and that a conditional writ of habeas corpus issue directing the State either to retry petitioner within 180 days or release him from custody.

## I. PROCEDURAL HISTORY

The September, 2008 term of the Franklin County, Ohio grand jury returned a two-count indictment against petitioner, charging him with one count of aggravated murder with a firearms specification and one count of murder with a firearms specification. Both counts alleged that petitioner murdered one Marlon Jones on July 18, 1995. *See Return of Writ*, Exhibit One.

Petitioner filed a motion to dismiss based on pre-indictment delay, noting that he

had previously been indicted for the same crime on August 4, 1995, and that after that indictment was dismissed in November of the same year, more than thirteen years went by before the more recent indictment was filed.  After that and several other pretrial motions were denied, petitioner went to trial before a jury and was found guilty of two counts of murder without specification.  In an amended judgment entry filed on November 20, 2009,  the trial judge sentenced petitioner to a prison term of fifteen years to life on count two.  *Return of Writ*, Exhibit Ten.

Through counsel, petitioner timely appealed his conviction and sentence to the Tenth District Court of Appeals. He asserted five assignments of error, as follows:

> **FIRST ASSIGNMENT OF ERROR**: THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT-APPELLANT'S MOTION TO DISMISS THE INDICTMENT DUE TO PRE-INDICTMENT DELAY IN VIOLATION OF DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL GUARANTEED BY AMENDMENTS V, VI AND XIV OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

> **SECOND ASSIGNMENT OF ERROR:** THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY THAT A PERSON MUST ACT "WITH THE KIND OF CULPABILITY REQUIRED FOR THE COMMISSION OF AN OFFENSE" TO BE CONVICTED ON A COMPLICITY THEORY OF GUILT, THEREBY DEPRIVING DEFENDANT-APPELLANT OF HIS RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL AS GUARANTEED BY AMENDMENTS V AND XIV OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10  OF THE OHIO CONSTITUTION.

> **THIRD ASSIGNMENT OF ERROR:**  THE TRIAL COURT

2

ERRED WHEN IT OVERRULED DEFENDANT-APPELLANT'S OBJECTIONS TO THE ADMISSION OF EVIDENCE RELATING TO DEFENDANT-APPELLANT'S AFFILIATION WITH A STREET GANG INVOLVED IN DRUG TRAFFICKING AND HIS INCARCERATION IN FEDERAL PRISON FOR OTHER CRIMES, IN VIOLATION OF DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL GUARANTEED BY AMENDMENTS V AND XIV OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**FOURTH ASSIGNMENT OF ERROR:** THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT AS TO COUNTS ONE AND TWO OF THE INDICTMENT WHEN THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL GUARANTEED BY AMENDMENTS V AND XIV OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**FIFTH ASSIGNMENT OF ERROR**: THE TRIAL COURT ERRED WHEN IT CREDITED DEFENDANT-APPELLANT 123 DAYS OF CREDIT AGAINST HIS SENTENCE RATHER THAN THE 676 DAYS REQUESTED BY DEFENDANT-APPELLANT, IN VIOLATION OF HIS RIGHT TO EQUAL PROTECTION OF THE LAW UNDER THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF OHIO.

*Return of Writ*, Exhibit Twelve.  In an opinion filed on August 5, 2010, the state court of appeals overruled petitioner's first four assignments of error but vacated the sentence and remanded so that the trial court could award petitioner additional jail time credit.  *Return of Writ*, Exhibit 14; *State v. Langford.*, 2010 WL 3042185 (Franklin Co. App. August 5, 2010).

Petitioner, through counsel, appealed that decision to the Ohio Supreme Court.  In

his memorandum in support of jurisdiction, petitioner raised two issues, phrased as follows:

**FIRST PROPOSITION OF LAW**

A TRIAL COURT ERRS WHEN IT REFUSES TO DISMISS AN INDICTMENT ON GROUNDS OF PRE-INDICTMENT DELAY WHEN THERE HAS BEEN A DELAY OF OVER THIRTEEN YEARS BETWEEN DISMISSAL OF THE FIRST INDICTMENT AND FILING OF THE SECOND INDICTMENT. SAID ERROR DEPRIVES A DEFENDANT OF HIS RIGHTS TO DUE PROCESS OF LAW, A FAIR TRIAL, AND THE RIGHT TO COUNSEL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

**SECOND PROPOSITION OF LAW**

A TRIAL COURT ERRS WHEN IT FAILS TO INSTRUCT THE JURY THAT A COMPLICITOR MUST ACT WITH THE KIND OF CULPABILITY REQUIRED FOR THE COMMISSION OF AN OFFENSE TO CONVICT A DEFENDANT ON A THEORY OF COMPLICITY CONTRARY TO THE DUE PROCESS CLAUSE AND THE RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION.

The State of Ohio filed a cross-appeal on the issue of jail time credit. *Return of Writ,* Exhibits Fifteen through Eighteen. In an entry filed on January 19, 2011, the Ohio Supreme Court declined to accept the appeal and the cross-appeal. *Return of Writ*, Exhibit 20; *State v. Langford*, 127 Ohio St.3d 1503 (January 19, 2011).

During this same time period, petitioner, also through counsel, filed a motion to reopen his appeal, arguing that his appellate counsel was ineffective for failing to raise additional issues on appeal, including certain claimed errors in the jury instructions, a comment made by a witness about another murder, and the trial court's failure to suppress petitioner's statements to the police. In a decision dated January 27, 2011, the state court of appeals denied the application. *Return of Writ*, Exhibit 23. Petitioner also appealed that decision to the Ohio Supreme Court, but it again declined to accept the appeal. *Return of Writ,* Exhibit 27; *State v. Langford*, 128 Ohio St.3d 1502 (May 25, 2011).

On February 3, 2012, petitioner timely filed his petition for a writ of habeas corpus. He asserts five grounds for relief. The first four are identical to his first four assignments of error presented to the Tenth District Court of Appeals. The fifth raises the issues presented in his application for reopening his appeal. It is Respondent's position that claims three and four were procedurally defaulted because they were not raised before the Ohio Supreme Court, and that claims one, two and five are without merit.

## II. THE FACTS

The basic facts of the case are recited in the state court of appeals decision. This Court is generally bound to accept those facts as true for purposes of this action. *See* 28 U.S.C. §2254(d)(1). Here is how the state court characterized the facts:

> Marlon Jones was shot and killed on July 18, 1995. Mark Langford, under the alias James Allen, was indicted on August 4, 1995 and accused of aggravated murder as a result of the shooting. That original indictment was dismissed about three months later when a key witness, Nichole Smith, did not honor

her subpoena and appear to testify at trial. Apparently unbeknownst to authorities, Langford was still a minor when the shooting occurred.

Columbus police detectives continued their investigation and interviewed Langford in September 1997 and June 1998. Finally, Langford was interviewed over ten years later while he was incarcerated on federal charges.

Police filed new charges against Langford with respect to the shooting of Marlon Jones in the Juvenile Division of the Franklin County Court of Common Pleas and the case was bound over to the General Division of the Franklin County Court of Common Pleas in October 2008. This led to a two count indictment charging Langford with aggravated murder, in violation of R.C. 2903.01, and murder, in violation of R.C. 2903.02. Each count carried a three-year firearm specification.

\* \* \*

The testimony at trial indicated that Langford was shooting a handgun when Marlon Jones was killed. Nichole Smith testified that [three] men were shooting. One was shooting an assault rifle and two were shooting handguns. Nicole could not say which handgun Langford was shooting.

Federal prisoner Jason Arnold testified that Langford told him about the three men shooting at Marlon Jones and confessed to being one of the three. Langford claimed that he was shooting a .22 caliber handgun and not the .357 caliber handgun which fired the fatal shot.

*State v. Langford.*, 2010 WL 3042185, *1, *4-5. Additional facts which relate to the specific

claims asserted in the petition will be discussed in connection with those claims.

### III. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional

rights of criminal defendants, and in order to prevent needless friction between the state

6

and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies.  *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  But if, because of a procedural default, the petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error.  *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule."  *Id*.  Second, the Court must determine whether the state courts actually enforced the state procedural sanction.  *Id*.  Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim.  *Id*.  Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was

actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

In this case, respondent contends that grounds three and four have been procedurally defaulted because they were not presented to the Ohio Supreme Court when petitioner filed his memorandum in support of jurisdiction. In his traverse, petitioner concedes that these claims have been waived. The failure to present claims to the highest court of the state is a clear procedural default which this Court has enforced on numerous occasions. *See, e.g., Gorman v. Warden, Chillicothe Correctional Inst.*, 2012 WL 1678962, *7-8 (S.D. Ohio May 14, 2012)**, *adopted and affirmed* 2012 WL 4050069 (S.D. Ohio September 13, 2012), *citing, inter alia, Silverburg v. Evitts*, 993 F.2d 124 (6th Cir. May 13, 1993) **.** The Court will therefore not discuss these two ground of relief any further.

## IV.  GROUND ONE - PRE-INDICTMENT DELAY

Petitioner's first non-defaulted ground for relief is his claim based on pre-indictment delay.   Before turning to an analysis of that claim, the Court sets forth the legal standard under which this claim and the other non-defaulted claims will be reviewed.

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104-132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and "demands that state-court

decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam ).  *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)(footnote omitted) .

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.  28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

In applying this statute, the Supreme Court has held that "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). To obtain habeas corpus relief, a petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 132 S.Ct. 261, **1 (2011), *quoting Harrington v. Richter*, 562

U.S. ––––, ––––, 131 S.Ct. 770, 786–87 (2011). This bar is "difficult to meet" because "habeas

corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not

a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct.

at 786 (*quoting Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in

judgment)). In short, "[a] state court's determination that a claim lacks merit precludes

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the

state court's decision." *Id., quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The trial judge held a hearing on the motion to dismiss based on pre-indictment

delay at which both petitioner and a Columbus police detective, Detective Reese, testified.

The state court of appeals summarized the testimony at the hearing as follows:

> Detective Reese is a member of what is commonly called the
> cold case unit of the Columbus Division of Police. He did not
> receive responsibility for the case until February 2006-over ten
> years after the shooting. Of the two detectives previously
> assigned to the homicide, one had retired and one had
> transferred from the homicide squad to another squad.
>
> Detective Reese reopened the investigation at the direction of
> his supervising sergeant after an associate United States
> Attorney contacted the Columbus Division of Police and
> indicated that two federal prisoners claimed to have
> information with respect to the Marlon Jones homicide. The
> federal prisoners claimed that they had talked to Langford
> and/or overheard him discussing the case with others. The
> federal prisoners claimed that Langford had confessed to
> involvement in the homicide. These claims led to the
> investigation with respect to the homicide being reopened.
>
> Detective Reese began looking for Nichole Smith and
> ultimately located her. Detective Reese also went to South
> Carolina to interview the two federal prisoners who claimed to

have information about Mark Langford.

In reviewing the police files, Detective Reese noted that the projectile which killed Marlon Jones had been ordered destroyed by a detective formerly assigned to the case. Detective Reese also acknowledged that a fingerprint of Langford on a cartridge box related to the case had also been destroyed after the first indictment was dismissed. Detective Reese also acknowledged that a potential witness, known as "Big Mike," had died in the intervening years. Further, Detective Reese acknowledged that the memory of other witnesses can fade after a significant lapse of time.

Langford also testified at the hearing on the motion to dismiss. He stated that he had been in federal custody for over eight years as a result of drug charges. He testified that when the case was originally indicted, he had a number of witnesses who would testify he was not involved. He listed "D Rock," whose first name was Deshaun, as such a witness and testified that "D Rock" had died during the intervening time. An exhibit showing that a Deshaun Williams had died in February 2001 was presented and ultimately admitted into evidence.

Langford claimed that "D Rock" had talked to the people involved in the homicide and had been told Langford was not involved.

Langford also testified a cousin named Don Gentry, known as "Big Mike," had lived in the neighborhood where the shooting occurred. Gentry had allegedly talked to people associated with Marlon Jones and could testify at trial. Gentry died in January 2000.

Langford testified that a second person known as "Big Mike" had supplied one of the guns involved in the shooting of Marlon Jones and had been available to testify back in 1995. This "Big Mike" would claim he provided a .357 Magnum to a Curtis Stokes, who was one of the shooters. Allegedly, this "Big Mike" was Paul Michael Ross, Jr., who was shot and killed in December 1998.

*State v. Langford.*, 2010 WL 3042185, *2-3. As the court of appeals also noted, the trial judge, relying on the United States Supreme Court's decision in *United States v. Lovasco*, 431 U.S. 783 (1977), denied the motion, finding that petitioner had not been prejudiced by the lengthy preindictment delay.

The state court of appeals identified *Barker v. Wingo*, 407 U.S. 514 (1972), as setting forth the test to be applied when determining whether the Sixth Amendment's guarantee to a speedy trial has been violated. Under *Barker*, the court is to consider and balance four factors: the length of delay, the party responsible for it, the defendant's assertion of the right to a speedy trial, and prejudice resulting from the delay. The court acknowledged that the delay was long and that petitioner was blameless in causing it, but held that "[t]he key issue under *Barker*, is the question of whether Langford was prejudiced by the delay." *State v. Langford, supra*, at *5. After reciting the trial court's reasoning behind a finding of no prejudice, the court of appeals held that "we cannot overturn the trial judge's finding that Langford had suffered no prejudice as a result of the pre-indictment delay" and consequently overruled his first assignment of error.

Here, the state trial court correctly identified the controlling law as announced by the United States Supreme Court. *See United States v. Brown*, 498 F.3d 523 (6th Cir. 2007) (applying *United States v. Lovasco* to a claim of pre-arrest delay). Further, the court of appeals correctly focused on the issue of whether petitioner suffered any prejudice from the delay. *See Brown*, 498 F.3d at 528 ("'proof of prejudice is generally a necessary but not sufficient element of a due process claim'"), *quoting Lovasco, supra*, at 322. The state court

of appeals' citation to *Barker v. Wingo,* which is a post-arrest case, may not have been technically correct, since "[p]re-indictment delay and post-indictment delay present separate issues," *see United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009), and pre-indictment delay is analyzed under the Due Process Clause rather than the Sixth Amendment, *see id.; see also United States v. LaTender*, 464 F.Supp. 607 (E.D. Wisc. 1979)(analyzing the period of time between a first, dismissed indictment and a re-indictment as pre-indictment delay and applying the *Lovasco* analysis to the delay); *Beckwith v. Anderson*, 89 F.Supp.2d 788 (S.D. Miss. 2000)(same). However, the tests are similar in that they identify prejudice to the defendant as either a necessary or a very weighty factor in the analysis. Thus, with respect to petitioner's first ground for relief, the issue for this habeas Court is simply whether the state courts unreasonably determined that petitioner was not prejudiced by the delay in bringing an indictment, or that any such prejudice was not sufficient, when balanced against the reasons for the delay, to justify dismissal of the indictment.

The Court will first analyze the way in which the state courts dealt with the issue of prejudice. Generally, defendants face an uphill struggle in attempting to prove actual prejudice from the passage of time between the crime and the indictment. As the Court of Appeals noted in *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir. 1997), even if a defendant can prove that witnesses died during the time period consumed by the delay, and "[e]ven where a defendant specifies what a deceased witness's testimony would have been, actual prejudice is difficult to prove." That is so, in part, because the defendant must not only

show what the witness would have said, but also that the witness' testimony would have stood up to cross-examination and the jury would likely have found the witness credible. The defendant claiming prejudice must also show that, given the other evidence in the case, the outcome of the trial would likely have been different had the deceased witness been available to testify. *See id., citing United States v. Valona*, 834 F.2d 1334, 1339 (7th Cir. 1987), and *United States v. Saunders*, 641 F.2d 659, 665 (9th Cir. 1980).

In his argument to the state appellate court, and in his traverse, petitioner emphasizes the testimony from that would have been available to him at an earlier trial from witnesses DeShaun Williams (also known as "D-Rock") and Paul Michael Ross, Jr., also known as "Big Mike." Both witnesses died between 1995 and 2008. Their testimony is outlined above.

The state appellate court found, first, that Mr. Williams' (or D-Rock's) testimony that others confessed to him their involvement in the murder might have been admissible as a statement against interest, but that it was unlikely that the necessary corroboration of his testimony could have been obtained, and that without such corroboration, the prerequisites of admissibility under Ohio R. Evid. 804(B)(3) would not have been satisfied. This conclusion is not unreasonable and involves, in part, an interpretation of state law that this Court is not free to disagree with. However, petitioner also claims that Mr. Williams would have testified that he was with petitioner at another location when the shooting occurred, and this testimony would not have been subject to the need for corroboration since it would not have been hearsay in the first instance.

14

This argument was made in the motion to dismiss filed with the trial court. *See Return of Writ*, Ex. 3, at 5 ("Deshawn Willem [sic] - Individual was in a car near the scene of the shooting, could have testified that Langford was not with the shooters when they went to Marlon Jones [sic] house..."). At the hearing held on the motion to dismiss, petitioner testified that Mr. Williams "would have known that I wasn't with the shooters when the shooting occurred." According to petitioner, "we was [sic] on the next street over at the time that it happened." Hearing Tr., at 33. His attorney then argued that two of the three witnesses identified at the hearing - and it seems clear that he included Mr. Williams as one of the two - "would have given exculpatory evidence." Hearing Tr., at 57, and in his rebuttal remarks, he made this point explicitly, stating that "Deshawn [sic] Williams ... could have provided eyewitness evidence that could exonerate Mr. Langford ...." Hearing Tr., at 69. Thus, petitioner did present evidence, and argue to, the state trial court that Mr. Williams could have given exculpatory testimony on an eyewitness basis, and not just through hearsay which would have required some type of corroboration.

The trial court ruled on the motion to dismiss on the record. Trial Transcript, Vol. II. That court found that the three potential witnesses identified by petitioner were indeed deceased, and that "information from two potential witnesses certainly put into question whether Mr. Langford was involved in the crime that resulted in the death of Marlon Jones." *Id*. at 8. However, the trial court concluded that "I cannot say with certainty that the State's delay has caused Mr. Langford actual prejudice ...." *Id*. at 7-8. Although the trial court did address this issue, the potential impact of Mr. Williams' non-hearsay testimony

15

was not discussed in the state court of appeals decision, which addressed only his hearsay testimony.  Still, because the potentially prejudicial impact of Mr. Williams' unavailability was addressed by the trial court, there is a state court decision as to that impact to which this Court owes deference, and it is petitioner's burden to show that the trial court either applied an incorrect legal standard or that "there was no reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011).

The legal standard which the trial court used to decide the motion to dismiss required petitioner to show "with certainty" that he was prejudiced by his inability to call Mr. Williams to testify that the two of them were together, and at a different location (around the corner) at the time of the shooting.  In *United States v. Lovasco, supra*, the Court declined to adopt a *per se* rule that every time pre-indictment delay caused prejudice to a defendant, the indictment must be dismissed, but it also did not create a hard and fast rule about how to evaluate whether the type of prejudice suffered by a defendant justified dismissing the charges, instead holding that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."  *Lovasco*, 431 U.S. at 790. Thus, *Lovasco* did not set a standard of proof of "certainty," but neither did it set any other standard of proof, instead stating that "settled principles of due process" apply to this type of claim.  *Id*. at 797.

One type of due process violation which arises with some frequency in the criminal law context is the prosecution's failure to disclose evidence favorable to the accused.  In

*Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process ...." However, even if favorable evidence has been withheld, the defendant is not automatically entitled to relief. Rather, as in the context of pre-indictment delay, the defendant must show prejudice. In the *Brady* context, prejudice sufficient to justify reversing a conviction can be shown if "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). There is no reason to believe that any different standard would apply here. The test formulated in *United States v. Velona,* 834 F.2d 1334, 1339 (7th Cir. 1987), which was cited approvingly by the Court of Appeals for this Circuit in *United States v. Rogers*, 118 F.3d 466, 475 (6th cir. 1997), suggests as much, requiring not certainty that the testimony of the now-deceased witness would have produced a different outcome, but only that the witness would have testified favorably to the defendant, his testimony would have stood up to cross-examination, and the jury would have found him credible. *Rogers* also implies that such a determination is difficult to make in advance of trial, requiring, at least in some cases, the consideration of all of the other trial testimony. *See id., citing United States v. Saunders*, 641 F.2d 659, 665 (9th Cir. 1980). That, of course, did not happen here, at least with respect to Mr. Williams' non-hearsay testimony, because the trial court made its ruling before taking any trial testimony and the state appellate court did not discuss this aspect of Mr. Williams' testimony at all. It might fairly be concluded that, at least with respect to the prejudice prong of the *Lovasco* test, the state courts proceeded in a manner

contrary to established federal law by imposing a heightened burden of proof on petitioner and failing to determine if Mr. Williams' testimony would have withstood cross-examination or been found credible by the jury.

Even if petitioner succeeds on this part of his claim, however, *Lovasco* points out that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Lovasco*, 431 U.S. at 790. Further, the courts have generally rejected the idea that these two factors are to be weighed; rather, the test is a conjunctive one, meaning that a petitioner who seeks relief based on pre-indictment delay must not only prove prejudice - something which petitioner may well have done here, or, at a minimum, may have demonstrated a flaw in the state court proceedings in terms of how prejudice was to be established - but must also prove an intent on the government's part to delay prosecution in order to gain an advantage over the defendant. In other words, absent this type of intent on the State's part, no amount of prejudice can justify dismissing a case for pre-indictment delay. *See, e.g., United States v. Brown*, 667 F.2d 566, 568 (6th Cir. 1982)("Dismissal for pre-indictment delay is warranted only when the defendant shows substantial prejudice to his right to a fair trial *and* that the delay was an intentional device by the government to gain a tactical advantage" (emphasis supplied)); *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992)("a defendant's Fifth Amendment due process rights are generally not implicated where the government offers a valid reason for the delay"); *United States v. Sanders*, 452 U.S. 572, 581 n. 6 (6th Cir. 2006)("This court has interpreted

18

*Lovasco* to hold that both conditions are necessary to find a due process violation"). The question then becomes whether the state court determination of this issue is either contrary to, or an unreasonable application of, established federal law.

The state trial court found, as a fact, that "the dely demonstrated by the State .... was not undertaken to gain a tactical advantage over Mr. Langford." Trial Transcript, Vol. II, at 7. However, the trial court also stated that "I don't know how or why the State was not able to proceed with its case or why or how it chose not to pursue this case again until 2008," *id* at 5, a finding which is difficult to reconcile with the ultimate conclusion that the reason for the delay was not to gain some tactical advantage. Perhaps the trial court simply concluded that, as to this issue, petitioner had failed in his burden of proof. The state court of appeals did not address the question at all, focusing only on the finding of lack of prejudice, perhaps because it did not apply the *Lovasco* test but rather the four-part analysis of post-arrest delay set out in *Barker v. Wingo* 407 U.S. 514 (1972). Still, the ultimate result reached by the state courts is entitled to AEDPA deference even if the analytical process was flawed in some respects. *See Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("The law requires such deference to be given even in cases, such as this one, where the state court's reasoning is flawed or abbreviated"). In other words, the question here is whether it was reasonable for the state court to have denied petitioner relief on the basis of this record because the State did not engineer the delay in order to prejudice him. *See also Hennon v. Cooper*, 109 F.3d 330, 334-35 (7th Cir. 1997)("It doesn't follow that the criterion of a reasonable determination is whether it is well reasoned. It is not. It is whether the

determination is at least minimally consistent with the facts and circumstances of the case"), *quoted* in *Holder, supra*.

Although petitioner makes a forceful argument that the State delayed re-indicting him in this case in order to put him at a tactical disadvantage, the facts presented to the state trial court do not compel that conclusion.  It may well be true that the State did not make a diligent effort, in the intervening thirteen years, to locate its key witness, Nichole Smith, and that the failure of the Columbus Division of Police to look for her aggressively between 1995 and 2006, when the case was assigned to the Division's "cold case" squad, was the product of lack of interest or lack of effort.  But that is not the same as conduct designed to make it more difficult for a defendant to mount a defense.  Although some courts have found a due process violation when the government does not come forward with a good explanation for a substantial delay, leading to the conclusion that the lack of legitimate justification for the delay amounts to the kind of intentional or reckless conduct which *Lovasco* envisioned (*see, e.g., United States v. Sabath*, 990 F.Supp. 1007 (N.D. Ill. 1998)), that type of analysis seems foreclosed by controlling case law in this Circuit.  *United States v. Castro-Ramirez*, 2009 WL 4950504 (E.D. Mich.  Dec 15, 2009)(explaining that "[a]s noted by the *Sabath* court, however, there is a circuit split on the issue of whether intent by the government is required to be explicitly proven, and the Sixth Circuit requires such a showing of intent").  *United States v. Brown*, 959 F.2d 63 (6th Cir. 1992), quoted above, does appear to require proof of an intent to undermine the defendant's case, and this Court has so held.  *United States v. Davis*, 231 F.Supp. 2d 701, 707 n.4  (S.D. Ohio 2002)(rejecting the

defendants' argument "that the second prong [of the *Lovasco* test] can be satisfied by a showing that the Government acted with 'reckless disregard' for the probable prejudicial impact on [their] defense," and citing, *inter alia,* to *Brown).*

Given that standard, in order for petitioner to succeed on his claim here, the evidence before the state court would have to lead inescapably to the conclusion that the State knew that, by delaying in its search for Ms. Smith, it would be gaining a tactical advantage over petitioner. However, there was no evidence that the State even knew that petitioner had at least one witness who would place him elsewhere (although within a block or so of the crime scene) when Marlon Jones was shot, and that it was likely that if enough time went by, that witness would either forget or become unavailable. The destruction of physical evidence which accompanied the delay was found by the state courts not to have prejudiced petitioner in any substantial way, and that seems a reasonable conclusion, so the State did not necessarily intend, by both delaying and then failing to take care of the evidence properly, to undercut petitioner's ability to defend against the charges. And, finally, there is no evidentiary support for petitioner's claim that "[t]he State also used the time to obtain jailhouse snitches ...." *Traverse*, Doc. 10, at 4. It happened that the case was brought back to the State's attention by two jailhouse informants, but in 1995 and in years thereafter, the State had no way of knowing that petitioner would be incarcerated and might make incriminating statements to cellmates. To conclude that it intended that consequence would, on this record, be nothing more than speculation, and there is no requirement under the AEDPA or otherwise that a state court

21

engage in such speculation.  To the contrary, the failure to do so can hardly be described as unreasonable.  For all of these reasons, the Court finds that although the state courts' approach to petitioner's pre-indictment delay claim was problematic, the decision to deny relief on that claim was not unreasonable or contrary to law.  Ground One therefore lacks merit.

## V.  GROUND TWO - ERRONEOUS JURY INSTRUCTION

In his second ground for relief, petitioner asserts that after counsel had agreed upon a jury instruction relating to the state of mind necessary to convict a defendant of complicity to commit murder, the trial judge inexplicably failed to give that instruction. As a result, he claims that the jury was never properly instructed as to the *mens rea* element of the crime of complicity and that his conviction on that count was constitutionally flawed.

The state court of appeals disposed of this claim in this fashion:

> The second assignment of error asserts that the trial court gave an inaccurate charge on the topic of complicity. Complicity is addressed in R.C. 2923.03(A), which reads:
>
> No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

22

The State of Ohio presented two theories at trial. One was that Langford was the actual shooter and therefore a principal offender in the homicide. The other theory was that Langford was an accomplice.

Establishing complicity requires that the State prove that the alleged accomplice acted with the kind of culpability required for the commission of the offense. When the offense is murder, the accomplice must have acted with a purpose to kill, since murder was defined in R.C. 2903.02(A) in 1995, in pertinent part: "No person shall purposely cause the death of another[.]"

Trial counsel did not object to the charge given to the jury on complicity after the charge was given. The charge did include a complete definition of "purposely," which is defined in R.C. 2901.22(A) as follows:

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

In the context of this case, the "certain result" which the jury had to consider and apparently did consider in this deliberation was the death of Marlon Jones. The jury, by its verdict, found that Langford had a specific intention to cause the death of Marlon Jones, either by his own intention or by the transpired intent of the shooter who was actually using the Ruger .357. The jury could not have been misled by the charge given, nor could it have found Langford guilty based upon an error in the jury charge. No reversible error is present with respect to the jury charge or complicity.

The second assignment of error is overruled.

*State v. Langford*, 2010 WL 3042185, *5-6.

Respondent first argues that in this ground for relief, petitioner raises only the claim

that the jury instructions did not conform to Ohio law, and that such a claim is not cognizable in federal habeas corpus.  However, ground two is clearly predicated on the Due Process clause and its requirement, as explained in *In re Winship*, 397 U.S. 358, 362 (1970), that "proof of a criminal charge beyond a reasonable doubt is constitutionally required."  Petitioner argues that the jury was not told, under the instructions given, that in order to find him guilty under a complicity theory, it had to conclude beyond a reasonable doubt that he acted with the required intent - which, under Ohio law, was with the purpose to kill - because no specific instruction was given to the jury on that point. Consequently, ground two cannot be dismissed on grounds that it raises only state law issues.

Errors in jury instructions warrant habeas corpus relief only in "extraordinary circumstances" where the error so infected the entire trial as to deprive the petitioner fundamental fairness, constituting a denial of due process.  *See Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007)(citations omitted); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).   A federal habeas corpus reviews an alleged error in jury instructions not in isolation, but in context of the overall charge.  *Boyde v. California*, 494 U.S. 370, 378 (1990), *quoting Cupp v. Naughten*, 414 U.S. 141, 146-147 (1973). Where the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle, supra*, at 72, *quoting Boyde*, at 380.

The record (Trial Transcript, Vol. VII) shows that the trial judge first instructed the

jury as to the elements of aggravated murder, as charged in Count One of the indictment, and included a definition of "purpose to kill." *Id.* at 115. The jury was also instructed on the elements of murder, as charged in both Counts One and Two, and was told that the word "purposely" used in the definition of that crime had the same meaning as the court previously explained. *Id.* at 119. A third instruction was given on the crime of involuntary manslaughter under Counts One and Two. Instructions were also given on the firearm specification. Finally, the jury was told that petitioner could also be convicted as a complicitor or an aider and abettor "to any or all counts and specifications of the indictment." *Id.* 124. As to the murder counts, the trial judge instructed the jury that it could find defendant guilty only if he "aided or abetted another in purposely committing the offenses of Aggravated Murder or Murder or aided and abetted another and (sic) knowingly committed the offense of Involuntary Manslaughter." Aiding and abetting were both defined, but the jury was not told what intent a defendant must have had when taking any of the various acts which constitute aiding and abetting (which, as explained by the trial court, included aiding, assisting, supporting, encouraging, cooperating with, advising, or inciting) . *Id.* at 125.

It is clear that the additional language agreed to by counsel, and apparently required by Ohio law, to the effect that an aider or abettor must have the same intent as the person who committed the crime, was omitted from this portion of the jury instructions. What is more, although the state court of appeals correctly observed that the charge did include a complete definition of "purposely," that definition came during instructions on the crimes

25

of aggravated murder and murder, and the relationship between the intent needed to convict petitioner of those crimes as a principal offender, and the intent needed to convict him under an aiding and abetting, or complicity, theory was not made clear.   This Court concludes that the jury instructions were, in fact, flawed, because they did not make it clear to the jury that petitioner could be convicted as an aider and abettor only if he acted with purposeful intent when he committed whatever act the jury might have concluded was done to aid and abet the murder of Marlon Jones.   *See, e.g. Sandstrom v. Montana*, 442 U.S. 510, 523 (1979)(jury instructions are constitutionally insufficient if, as a result of the instructions, the "State was ... not forced to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged,'" *quoting In re Winship, supra* at 364); *United States v. O'Dell*, 462 F.2d 224, 232 (6th Cir. 1972)("the failure of a [trial judge] to set forth clearly one of the essential elements of an offense creates such a significant flaw in the trial process as to require reversal of any convictions obtained for the offense involved"); *.see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991)(an ambiguous jury instruction is constitutionally infirm if "'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"), *quoting Boyde v. California*, 494 U.S. 370, 380 (1990).   The state appellate court's decision, which apparently was premised on the conclusion that the instructions as a whole were not ambiguous (which would explain that court's failure to discuss the controlling principle as set forth in *Boyde)*, is not reasonable given the absence of any language in the jury instructions, even when viewed in their  entirety,  telling the jurors either that intent was an element of the aiding

26

and abetting theory, or what that intent element was.  And if the state court believed that

it was not error for the trial judge to, in the words of the *O'Dell* court, "set forth clearly one

of the essential elements of [the] offense," *i.e.* intent, that would be clearly unreasonable as

well.

> Ordinarily,

> > "Failure to instruct on such an essential element as intent or knowledge requires reversal because the 'Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *United States v. Laughlin,* 26 F.3d 1523, 1527 (10th Cir.1994) ( *quoting In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970)), *cert. denied,* ––– U.S. ––––, 115 S.Ct. 428, 130 L.Ed.2d 342 (1994); *see also Cole v. Young,* 817 F.2d 412, 424 n. 8 (7th Cir.1987) ("Indeed every federal court to consider the question since the Court decided *In re Winship* ... has agreed that a conviction procured without any jury instruction on an essential element of the offense is constitutionally invalid.").

*Keating v. Hood,* 922 F.Supp. 1482, 1486 (C.D. Cal. 1996)(granting petition for a writ of

habeas corpus due to jury instruction that failed to include required intent).  For the

following reasons, that rule applies here.

Although the Court finds that there was a reasonable likelihood that the trial court's

error affected the jury's verdict, it does not adopt petitioner's argument about why that is

so.  Petitioner contends that when the jury found him guilty of murder, it must have

concluded that he was guilty only as a complicitor.  The verdict forms do not appear to

have distinguished among the various theories under which petitioner could have been

found guilty of murder, so there is nothing in those forms which mandates that conclusion.

And although petitioner argues that by finding him not guilty of the firearm specification, the jury clearly determined that he was not the principal offender, that argument misunderstands the law relating to jury verdicts.

A jury need not act either rationally or consistently when it returns a verdict in a criminal case.  Petitioner may be right that the acquittal on the firearm count is completely inconsistent with a finding that he was a principal offender; however, as the Court of Appeals for this Circuit has stated, "such post-conviction inquiry into the jury's deliberations is not for our consideration. We have been instructed, consistently since 1932, not to ponder the thought processes of a jury with respect to different counts in the same indictment ...." *Drake v. Superintendent, Trumbull Correctional Institution*, 106 F.3d 400 (6th Cir. January 14, 1997)(unreported), *citing United States v. Powell*, 469 U.S. 57 (1984).  Rather, as the *Powell* court held, one explanation for such seeming inconsistencies is that the jury, having convicted on the more serious offense, "then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id*. at 65.  But the State cannot appeal such an acquittal, and it would be unfair to allow the defendant to use such an inconsistency to obtain a new trial.  *Id*.  Therefore, the Court's response to  such a situation is, rather than to inquire into the jury's thought processes, simply to conduct an "independent review of the sufficiency of the evidence" in order to "protect[] against jury irrationality or error ...." *Id*. at 66.

The result of this admonition against assuming what was in the jurors' minds when they return a seemingly inconsistent verdict means, for purposes of this case, that the Court

cannot assume that the jury found petitioner guilty only on an aiding and abetting theory. There was no flaw in the instructions concerning how petitioner could have been convicted as a principal offender.  The question then becomes whether, under the particular facts of this case, the omission of the *mens rea* instruction on the complicity theory was sufficiently serious to call into doubt the jury's verdict on either theory, including one where the instructions were constitutionally adequate.  This is not an easy question to answer, and it is one which the state court of appeals did not address directly because it found no error at all in the instructions.

In a very recent decision, the Court of Appeals explained the law as it relates to jury instruction error.  *See Dawson v. United States*, — F.3d —, 2012 WL 6633106 (6th Cir. December 21, 2012).  That case, which was, like this one, a collateral attack on a conviction, involved charges of possession of a firearm by a convicted felon and possession of a stolen firearm. The defendant's primary claim was that the trial court erred by instructing the jury that he could be found guilty if he constructively, rather than actually, possessed the firearm in question, because there was no evidence to support a constructive possession theory.  The Court of Appeals found that the trial court should not have given an instruction on constructive possession because there was no evidence to support that theory, but held that it was harmless error because "viewing the record as a whole, it is clear that the jury found Dawson guilty based on a theory of actual possession."  In other words, "[w]hile the constructive possession instruction was error, it was harmless because, had it not been given, the jury undoubtedly would have convicted Dawson of actual possession." *Dawson*,

29

2012 WL 6633106, *2, *citing United States v. McCoy*, 767 F.3d 395, 397 (6th Cir. 1985).

This case appears to present just the opposite situation. Despite the fact that the Court does not know, and is legally unable to assume, that the jury convicted petitioner as an aider and abettor rather than as a principal offender, it cannot be said that, had the aider and abettor instruction not been given, the jury "undoubtedly" would have convicted petitioner of being a principal offender. *Dawson* contemplates that the Court will review the record as a whole to determine if a jury instruction error is harmless; viewing this record as a whole, the Court must factor in the acquittal on the firearm specification and the uncontroverted evidence that the fatal shots were fired from a .357 handgun. Yet petitioner stated in his supposed confession to another prisoner, which was a primary piece of evidence at trial, that he was shooting a .22 handgun and that another individual was armed with the .357. There was no physical evidence linking petitioner with that weapon and no eyewitness testimony placing it in his hands. Thus, while the jury could conceivably have convicted petitioner as a principal offender - a conviction which might have been subject to a challenge based on the sufficiency of the evidence - it is at least as likely, if not more so, that it convicted him as an aider and abettor. Without the flawed instruction, therefore, there is a reasonable probability that he would not have been convicted.

To reach that conclusion is to find that the state court's decision was either contrary to, or an unreasonable application of, clearly established federal law. In *Dawson*, the Court of Appeals distinguished prior cases such as *United States v. James*, 819 F.2d 674 (6th Cir.

30

1987), on grounds that the jury instruction error in those cases was not harmless.  *James*, which also involved an erroneous instruction on constructive possession of a firearm, presented the question of whether giving such an instruction was harmless in a case where the government's theory was that the defendant actually possessed the firearm, and his testimony was that he never possessed it at all (although he may have been aware of its presence in the residence).  The Court of Appeals refused to find the error harmless, finding "it more probable than not that the erroneous instruction materially affected the verdict in that the jury may well have convicted defendant under a theory of constructive possession." *James*, 819 F.2d at 676.  Here, the jury may well have convicted petitioner of complicity, and if it did so, it could have, under the jury instructions given, found him guilty without concluding that the State had proved an element of that crime - purposeful intent - beyond a reasonable doubt.  This also satisfies the harmless error standard applicable on collateral review as announced in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which "is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict,'" *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946). The error here did, in this Court's view, have such an effect on the jury's verdict, and although the state court did not actually make a contrary finding because it did not consider the question, any such finding would, on this record, be an unreasonable application of the proper constitutional standard.  Petitioner is therefore entitled to relief on his second ground.

## VI.  GROUND FIVE - INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his fifth and final ground for relief, petitioner argues that his appellate counsel was constitutionally ineffective in several respects by omitting certain arguments from the issues raised on appeal. The omitted arguments, according to petitioner, included counsel's failure to argue that the trial court committed error with respect to various aspects of the jury instructions; that the trial court erred in not granting a mistrial; and that the trial court erred by not granting a motion to suppress statements which petitioner made to the police. The state court of appeals denied relief on this claim, which was presented in a motion to reopen the appeal, stating:

> The application for reopening under App.R. 26(B) alleges that counsel on the initial appeal rendered ineffective assistance of counsel by failing to raise a series of assignments of error with regard to the jury charge; an assignment of error attacking the trial court's failure to grant a mistrial; and an assignment of error questioning the trial court's failure to grant a motion to suppress some of Langford's statements to police. Because none of the proffered new assignments of error have merit, we deny the application for reopening.

> Addressing the last issue first, Langford was convicted of murder following a trial at which two federal prisoners who were incarcerated with Langford testified that Langford confessed to the murder to them. In addition, Nichole Smith, a former friend of Langford, testified at length about what occurred on the night of the homicide and how Langford and two other young men shot at the deceased. The shooters then ran away, bragging "we got them."

> At times, Langford acknowledged being nearby when the shooting occurred. He did not testify at trial and his acknowledgement that he was in the area was placed in evidence, along with his denial of being a shooter. Nothing in the record before us indicates that the trial court should have sustained the motion to suppress Langford's statements or that the statements were actually harmful to Langford's case.

> The second issue raised on this application for reopening is the failure of former appellate counsel to attack the trial court's overruling of a motion for a mistrial. One of the federal inmates who testified against Langford

stated with regard to conversation with Langford "when he first brought it up to me, he used to say things like he had killed someone before ..." (Vol. 5, Tr. 79.)

The trial judge sustained an objection to the statement because it could be construed as referring to one or more other homicides and made it clear to the jury that they should not consider the statement for any purpose whatsoever. The inmate then proceeded to testify about statements made by Langford about the homicide for which he was on trial.

The inmate's testimony did not automatically imply that Langford was involved in homicides other than the one for which Langford was on trial. At the time of the conversations, Langford had been in federal prison for several years, so any illegal activity engaged in by Langford had to have happened "before" the conversations. The trial judge cut off any testimony which could have detailed involvement in additional homicides and was within her discretion to refuse to grant a mistrial based upon the federal inmate's statements. An assignment of error raising the issue on initial appeal would have been overruled.

The remaining issues raised in the application for reopening all involve the jury charge given at trial. We note, as set forth earlier, the second assignment of error considered in the initial appeal questioned the jury charge given on the subject of complicity under R.C. 2923.03(A). The issue of the jury charge with regard to complicity was fully and carefully considered in the initial appeal, including the issue of mere presence at the scene of a crime. Langford was not convicted merely because he was present in the neighborhood when the shooting occurred and the jury charge given would not have allowed findings of guilt based solely upon his presence. No assignment of error on this issue had any prospect of success.

The application for reopening also alleges defects in the jury charge with respect to causation of the death of the deceased. Causation was not really an issue in the case. The victim was shot to death. The jury had before it testimony that Langford shot at the victim, as did two other individuals. One of the three shooters fired the fatal shot. Langford claimed responsibility to two federal inmates. In all likelihood, none of the shooters knew for sure who fired the fatal shot, but one of the three purposely caused the death and the other two were accomplices acting with the kind of culpability required for murder. Again, causation was not really an issue in the case.

The final issue regarding the jury charge is the failure of the trial court to give a jury instruction proffered by trial counsel for Langford on the

subject of the testimony from the federal inmates with whom Langford was incarcerated. The trial court had allowed extensive cross-examination on the benefits the inmates could hope or expect to receive for their testimony. The trial judge then gave a jury charge which talked about witness credibility which applied to all the witnesses.

The Ohio legislature has mandated a special jury charge to be given when accomplices or co-defendants testify at trial. The legislature has not required a special charge to be given when cellmates or fellow inmates testify. We are not in a position to second guess the legislature on this issue. Nor can we say that the trial court erred by failing to give a jury charge which applied to only two prosecution witnesses.

*State v. Langford,* No. 09AP-1140 (January 27, 2011), *Return of Writ,* Exhibit 23.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id.* at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

34

To establish the second prong of the *Strickland* test, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (*quoting Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

1. Were the omitted issues "significant and obvious?"

2. Was there arguably contrary authority on the omitted issues?

3. Were the omitted issues clearly stronger than those presented?

4. Were the omitted issues objected to at trial?

35

5. Were the trial court's rulings subject to deference on appeal?

6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7. What was appellate counsel's level of experience and expertise?

8. Did the Petitioner and appellate counsel meet and go over possible issues?

9. Is there evidence that counsel reviewed all the facts?

10. Were the omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir.1999). This list is not exhaustive and need not produce a certain "score." *Id*. at 428.

Here, the state appellate court did not cite any case law in its decision overruling the motion for reopening.  Nevertheless, it clearly conducted an inquiry into the prejudice prong of the *Strickland* test and determined that the claim of ineffective assistance of counsel lacked merit because, even had the omitted claims been raised on direct appeal as assignments of error, the court of appeals would not have reversed the conviction.  As with grounds one and two, this Court's role in the review process is confined to determining whether the state court's conclusion on the issue of lack of prejudice represents a decision which is contrary to, or an unreasonable application of,

controlling federal law.

Taking petitioner's claims in the order he discusses them in his traverse, the Court determines, first, that the state court was not unreasonable in finding that any additional assignment of error regarding the jury instructions about complicity would not have resulted in reversal.  It was the same state court, after all, which decided the initial appeal, and its finding that the "mere presence" issue was fully discussed and decided on direct appeal, as was the issue of whether the complicity instructions would have permitted the jury to convict based on petitioner's mere presence at the scene, is difficult to question.  Independently, this Court agrees that the jury instructions made it sufficiently clear that in order to find petitioner guilty on a complicity theory, he had to have committed some act in furtherance of the crime.  Even the specific language to which he objected - that "mere presence can be enough it if is intended to and does aid the primary offender" - told the jury that more than presence (*i.e.* the fact that the complicitor's presence actually aided the primary offender) was needed in order to convict.  Other jurisdictions have similar jury instructions, and other federal courts have approved them.  *See,e.g., Picado v. Adams*, 2010 WL 6815802 (C.D. Cal. Dec. 29, 2010), *adopted and affirmed* 2011 WL 2517258 (C.D. Cal. June 21, 2011).  Although the trial court might have been well advised also to give the proffered instruction that mere presence, *standing alone*, is not sufficient - a rule followed in Ohio, *see,e.g., State v. Johnson*, 93 Ohio St.3d 240 2001), the jury could reasonably have inferred that rule from the instruction actually given.  Appellate counsel was not ineffective for failing to raise this specific

claim.

Petitioner also argues that appellate counsel should have assigned as error the trial court's failure to declare a mistrial after one of the prosecution's witness, Isaac Jackson, made brief mention of another murder in which petitioner was once a suspect. It is important to quote the exact exchange which occurred in order to put this claim into context.

Isaac Jackson was one of the two cellmates who testified about petitioner's confession to being involved in Marlon Jones' murder.  He described how petitioner had told him details about the murder, as part of a conversation about whether petitioner might be able to get immunity for testifying as to his knowledge of it.  After describing many of the circumstances not only of the crime but also the first effort to try petitioner, which was curtailed when Nicole Smith failed to appear, Mr. Jackson was asked: "And if you know, what was the purpose with talking to you about the case? Was this bragging, or was there another purpose that you know of?"  Mr. Jackson's response, to which an objection was immediately sustained, was this: "When he first brought it up to me, he used to say things like he had killed someone before, so ....." (Trial Transcript, Vol. 5, at 79.  Defense counsel then approached the bench and moved for a mistrial, which the trial court denied because "[t]he question seems to suggest that he is talking about the present case."  *Id*. at 82.  The state court of appeals concluded that this was a discretionary ruling and within the zone of choice allowed to the trial judge.

In Ohio, defendants who appeal a trial court's denial of a motion for a mistrial face an uphill struggle.  "The grant or denial of an order of mistrial lies within the sound discretion of the trial court."  *State v. Garner*, 74 Ohio St. 3d 49, 59 (1999).  Such a ruling will be sustained on appeal "absent an abuse of discretion."  *State v. Treesh* 90 Ohio St. 3d 460, 482 (2001).  Although petitioner argues that the answer given by Mr. Jackson clearly referred to a murder other than the Marlon Jones murder and that it constitutes "other bad acts" evidence which is admissible under Ohio law, it is not so clear from the written transcript that his answer had to be interpreted that way.  Given the ambiguous nature of the reference, the immediate objection, the lack of any additional testimony or argument about other murders, and the heavy burden which would rest upon petitioner in the appeals court had this issue been raised - not to mention the appeals court's determination that it found the ruling to have been within the trial judge's discretion - it is not unreasonable to conclude that even if appellate counsel had assigned this matter as error, it would not have affected the outcome of petitioner's appeal.

Next, petitioner argues that the trial court's denial of his motion to suppress evidence should have been raised on appeal.  He claims that he was interrogated on five separate occasions, that he was given *Miranda* warnings only once, and that statements obtained in violation of *Miranda* were used against him at trial.  Again, he asserts that this claim, if raised, would have had a reasonable chance of changing the outcome of the appeal.  The court of appeals appears to have reached two separate conclusions

about this issue: that there was no basis for suppressing any of his statements, and that the statements (which placed Mr. Langford in the vicinity of the shooting, but did not implicate him in the shooting itself) were not prejudicial.  The trial court record shows that the State opposed the motion to dismiss on various grounds, depending upon which of the five interviews was at issue, including the fact that petitioner actually waived his *Miranda* rights on three occasions and that he was not in custody during one of the interviews.  *Return of Writ*, Exhibit 8.

Petitioner has not pointed to any specific statement which he believes was so incriminating as to justify suppression.  Rather, he refers generally to Detective Reese's testimony at Trial Transcript 6, pp. 6-81.  As Detective Reese stated, petitioner said these things: that he had been in Michigan the day of the murder, got back to Columbus that evening, and went straight home; that he learned that others had "armed up" to go to the scene of the murder, but that they dropped him at his home; that he actually witnessed the shooting;  conversely, that he was dropped off at his girlfriend's home before the shooters proceeded to the scene of the murder; and, finally, that he was close to the scene and heard the shooting take place, but did not participate.  He has also not demonstrated that there are facts in the record (no hearing appears to have been held on the motion to suppress) which would have persuaded the court of appeals that the State's arguments in opposition to the motion were not well-taken.  Finally, there was enough other evidence placing petitioner at or near the scene of the crime that any statements in which he conceded as much would have been largely cumulative.  Again,

given that the same appellate court which heard the direct appeal was disinclined to grant any relief on this ground because it lacked merit, this Court would be hard-pressed to label that decision unreasonable.

The state court of appeals addressed two additional issues not discussed in the traverse - that the trial court should have given a cautionary instruction on trusting the testimony of a cellmate, and that it should have told the jury more about causation.  The Court agrees with the analysis of the state appellate court on these issues.  Its finding that Ohio law does not warrant a "jailhouse informant" instruction means that this argument would not likely have succeeded if raised on direct appeal, and the same conclusion can be reached from its determination that causation was not an issue in the case.  Overall, there is no merit to petitioner's fifth ground for relief.

## VII.  CONCLUSION

For the reasons set forth above, it is recommended that relief be denied on petitioner's first, third, fourth and fifth claims; that relief be granted on his second claim; and that a conditional writ of habeas corpus issue directing the State either to retry petitioner within 180 days or to release him from custody.

## VIII.  PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is

made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp
United States Magistrate Judge

42